TRACY L. WILKISON
United States Attorney
CHRISTOPHER D. GRIGG
Assistant United States Attorney
Chief, National Security Division
REEMA M. EL-AMAMY (Cal. Bar No. 237743)
CHRISTINE M. RO (Cal. Bar. No. 285401)
Assistant United States Attorneys
Terrorism and Export Crimes Section
        1500 United States Courthouse
        312 North Spring Street
        Los Angeles, California 90012
        Telephone: (213) 894-0552/4496
        Facsimile: (213) 894-2927
        E-mail:    Reema.El-Amamy@usdoj.gov
                   Christine.Ro@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 20-209-PSG |
|---|---|
| Plaintiff, | GOVERNMENT'S OBJECTIONS TO THE PSR AND SENTENCING POSITION FOR DEFENDANT EDUARDO MORENO; DECLARATION OF CHRISTINE M. RO; EXHIBITS |
| v. | |
| EDUARDO MORENO, | |
| Defendant. | |

     Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Reema M. El-Amamy and Christine M. Ro, hereby files its Objections to the Presentence Report and Sentencing Position for Defendant Eduardo Moreno in the above-captioned case.

     This filing is based upon the attached memorandum of points and authorities, Declaration of Christine M. Ro and attached Exhibits A-B, the files and records in this case, the Presentence Investigation

Report, the Recommendation Letter, and such further evidence and argument as the Court may permit.

Dated: March 24, 2022          Respectfully submitted,

TRACY L. WILKISON
United States Attorney

CHRISTOPHER D. GRIGG
Assistant United States Attorney
Chief, National Security Division


            /s/
CHRISTINE M. RO
REEMA M. EL-AMAMY
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# Table of Contents

I.   INTRODUCTION................................................1

II.  STATEMENT OF FACTS.........................................1

III. THE PRESENTENCE INVESTIGATION REPORT.....................2

IV.  THE TERRORISM ENHANCEMENT APPLIES........................3

V.   THE PUBLIC WELFARE DEPARTURE APPLIES.....................8

VI.  GOVERNMENT'S SENTENCING RECOMMENDATION...................9

VII. DEFENDANT KNOWINGLY AND WILLFULLY DERAILED THE TRAIN.........11

VIII.    RESTITUTION...........................................13

IX.  CONCLUSION...............................................13

# <u>Table of Authorities</u>

Page(s)

**Cases**

<u>United States v. Awan</u>,
   607 F.3d 306 (2d Cir. 2010) ...................................... 7

<u>United States v. Benkahla</u>,
   501 F. Supp. 2d 748 (E.D. Va. 2007) ............................. 11

<u>United States v. Christianson</u>,
   586 F.3d 532 (7th Cir. 2009) ..................................... 6

<u>United States v. Cleaver</u>,
   163 Fed. App'x 622 (10th Cir. 2005) ............................. 6

<u>United States v. Dowell</u>,
   430 F.3d 1100 (10th Cir. 2005) ................................... 6

<u>United States v. Haipe</u>,
   769 F.3d 1189 (D.C. Cir. 2014) ................................... 8

<u>United States v. Salim</u>,
   549 F.3d 67 (2d. Cir. 2008) ...................................... 6

<u>United States v. Semsak</u>,
   336 F.3d 1123 (9th Cir. 2003) .................................... 8

<u>United States v. Tankersley</u>,
   537 F.3d 1100 (9th Cir. 2008) .................................... 6

<u>United States v. Tubbs</u>,
   290 Fed. Appx. 66 (9th Cir. 2008) ............................... 6

<u>United States v. Wright</u>,
   747 F.3d 399 (6th Cir. 2014) ..................................... 7

**Statutes**

18 U.S.C. § 1992............................................................ 4

18 U.S.C. § 2332b(g)(5)..................................................... 4

18 U.S.C. § 3553(a)........................................................ 11

18 U.S.C. § 3553(a)(1)...................................................... 9

18 U.S.C. § 3553(a)(4)-(6)...........................................10

**Rules**

U.S.S.G. § 2B1.1(b)(1)................................................ 2

U.S.S.G. § 2B1.1(b)(16)(A)............................................ 3

U.S.S.G. § 3A1.4................................................... 3, 4

U.S.S.G. § 3B1.3...................................................... 3

U.S.S.G. § 3K2.14..................................................... 3

U.S.S.G. § 4A1.3(b)(1)...............................................10

U.S.S.G. § 5K2.14.................................................. 8, 9

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**I.    INTRODUCTION**

3       In early 2020, at the onset of the global ("COVID-19") pandemic,

4   defendant Eduardo Moreno ("defendant") derailed a train, caused more

5   than $700,000 worth of damages, and narrowly escaped killing and/or

6   causing serious bodily injury to innocent bystanders.  After the

7   United States Naval Ship ("USNS") Mercy arrived in Los Angeles to

8   respond to the burgeoning pandemic, defendant intentionally derailed

9   the train near the naval ship because he believed the naval ship was

10  part of a government conspiracy to "get rid of" "healthy" and "open-

11  minded" people.  The derailed train leaked a significant amount of

12  fuel and stopped approximately 195 meters from the Port of Los

13  Angeles, where the USNS Mercy was docked an additional 50 meters

14  away.  For his conduct, a meaningful term of imprisonment is

15  warranted.  Consistent with the terms of the plea agreement, the

16  government respectfully recommends that the Court impose the

17  following sentence: (a) 77 months' imprisonment; (b) life-time

18  supervised release; (c) approximately $774,880.46 in restitution;

19  (d) mental health evaluation and treatment during the period of

20  supervision; and (e) a special assessment of $100.

21  **II.   STATEMENT OF FACTS**

22      On March 31, 2020, in the early months of the COVID-19 pandemic,

23  defendant, who was an engineer and train operator for the Pacific

24  Harbor Line, Inc. ("PHL"), intentionally derailed a train near the

25  USNS Mercy -- a hospital ship then docked in the Port of Los Angeles.

26  (PSR ¶ 10.)  He drove the train at a speed in excess of 40 miles per

27  hour and traveled in the wrong direction on the tracks while pulling

28  a cargo container.  (PSR ¶ 10 n.1.)

Moments before derailing the train, defendant pointed his middle finger to the internal train camera and lit a road flare inside the train. (Complaint, Dkt. No. 1, ¶ 14.) Defendant hit multiple concrete barriers and wire fences with the derailed train, narrowly escaped hitting at least three vehicles, and stopped short of hitting pedestrians. (See PSR ¶ 10 n.1; Government's Exhibit A, lodged with the court). The train's derailment also caused a significant fuel leak. According to PHL, the derailed train contained approximately 2,000 gallons of diesel fuel. Due to the leak, the Los Angeles County Fire Department Health Hazardous Materials squad directed a cleaning crew to clean the leak and the crew recovered approximately 400 gallons of fuel from the fuel tank and the ground adjacent to the derailment. After he was arrested, defendant admitted to intentionally engaging in this extremely dangerous conduct because he knew the location would cause a lot of interest and it would bring media attention. (PSR ¶ 18.)

Fortunately, defendant only damaged property and did not cause an explosion. Nevertheless, PHL incurred approximately $755,880.46 in damages to cover the costs of the destruction of their property that defendant intentionally caused.

**III. THE PRESENTENCE INVESTIGATION REPORT**

On February 8, 2022, the USPO disclosed the PSR and its recommendation letter. (Dkt. 67 "PSR Ltr."; Dkt. 69.) The USPO found that defendant's total offense level was 22, based on a base offense level of 7 under U.S.S.G. § 2B1.1(b)(1), and the following specific offense characteristics: (1) a 14-level increase for a loss that was more than $550,000 but less than $1,500,000 under U.S.S.G. § 2B1.1(b)(1)(H); (2) a two-level increase because the offense

2

1   involved the conscious or reckless risk of death or serious bodily

2   injury under U.S.S.G. § 2B1.1(b)(16)(A); (3) a two-level enhancement

3   for defendant's special skill as a train engineer under U.S.S.G.

4   § 3B1.3; and (4) a three-level reduction for acceptance of

5   responsibility under U.S.S.G. § 3E1.1.  (PSR ¶¶ 22-36.)  The USPO

6   erroneously failed to apply the terrorism enhancement and the one-

7   level Public Welfare enhancement, and did not provide a thorough

8   justification for its failure to do so.  (PSR ¶ 28.)

9        After incorrectly calculating a total offense level of 22 and a

10  criminal history category of I, the USPO determined that defendant's

11  Guidelines range is 41 to 51 months' imprisonment.  (PSR ¶ 100.)  The

12  USPO recommended a downward variance and recommended a sentence of 30

13  months' imprisonment, followed by three years of supervised release,

14  restitution in the amount of $700,000, and a $100 fine.  (PSR Ltr.)

15       The government objects to the USPO's Guidelines calculations for

16  two reasons.  First, the terrorism enhancement under U.S.S.G. § 3A1.4

17  applies for the reasons outlined below.  Second, the USPO did not

18  include a one-level enhancement for the Public Welfare departure

19  under U.S.S.G. § 3K2.14 as agreed upon by the parties.  The

20  government also objects to the USPO's recommendation of three-years

21  of supervised release.  Pursuant to the plea agreement, the parties

22  agreed that a lifetime period of supervised release is appropriate.

23  The government maintains that a sentence of 77 months' imprisonment

24  is appropriate based on the correctly calculated guidelines sentence

25  outlined below as well as the very serious nature of defendant's

26  conduct.

27  **IV.  THE TERRORISM ENHANCEMENT APPLIES**

28       It is inescapable that this case is, at its core, borne from

3

defendant's desire to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct. If an offense of conviction involves, or was intended to promote, a "federal crime of terrorism," U.S.S.G. § 3A1.4 provides a 12-level increase in the offense level, with a minimum offense level floor of 32, and an increase in the criminal history category to VI. Application Note 1 of § 3A1.4 adopts the definition of "federal crime of terrorism" set forth in 18 U.S.C. § 2332b(g)(5), namely, any offense enumerated in that subsection and that is "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5).

Thus, U.S.S.G. § 3A1.4 requires proof of two elements: (1) the defendant must have been convicted of an offense that involved or was intended to promote a federal crime of terrorism; and (2) the offense must have been "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." The government satisfies the first element, because train Wrecking, 18 U.S.C. § 1992, is an enumerated federal crime of terrorism under 18 U.S.C. § 2332b(g)(5)(B).

Given that 18 U.S.C. §1992 is an enumerated offense in 18 U.S.C. § 2332b(g)(5), application of the Terrorism Enhancement depends on whether defendant's crime was also calculated: (1) "to influence or affect the conduct of government by intimidation or coercion," or (2) "to retaliate against government conduct." See U.S.S.G. § 3A1.4; 18 U.S.C. § 2332b(g)(5). The facts show that defendant's offense was calculated to do both.

From the moment of his arrest, defendant made clear that he

derailed the train because of the government's response to the COVID-19 pandemic.  As he was being detained by the first police officer who responded to the crash, defendant exclaimed that "you only get this chance once," the "whole world is watching," and "now" people will "know what's going on here."  In subsequent Mirandized interviews with local law enforcement and FBI special agents, defendant elaborated that he "did it" because people needed to know what was going on with the COVID-19 pandemic and the USNS Mercy. Defendant claimed that he was suspicious of the USNS Mercy and believed it had an alternate purpose related to the pandemic or a government takeover.  Finally, he admitted that he intentionally derailed and crashed the train because he knew it would bring media attention and "people could see for themselves," referring to the USNS Mercy.  In defendant's own words, he wanted to "wake people up," and maintained that the USNS Mercy was suspicious and not "what they say it's for."  He reiterated that he was trying to draw the world's attention to the USNS Mercy, and stated that he couldn't "wait to see the video . . . I took the train off the end, I tried to get attention."

During his interview, defendant eagerly discussed various conspiracy theories related to the USNS Mercy and the COVID-19 pandemic.  He described spending time online researching "dark" Internet sites.  He stated that the USNS Mercy was part of a government conspiracy to bring healthy "open-minded" people onto the ship and "get rid of them."  He was fixated on the fact that the USNS Mercy appeared to have no windows and looked completely dark at night.  Defendant described reading Internet materials related to conspiracy groups, such as "X22 Report," the "Great Awakening," and

"Q" (possibly Q'Anon).  Defendant repeatedly asked law enforcement officers conducting the interview if the media was covering the fact that the derailed the train.

All of these statements -- and, of course, defendant's purposeful derailment of the train toward the Navy hospital ship -- show that his offense was "calculated to influence" the government's response to a global pandemic through "intimidation," and/or to "retaliate" against the deployment of the USNS Mercy to help respond to the pandemic.  Indeed, the Terrorism Enhancement in U.S.S.G. § 3A1.4 has been applied to a variety of crimes in the domestic terrorism context that, as here, were designed to coercively influence or retaliate against various types of domestic government action.  See, e.g., United States v. Tankersley, 537 F.3d 1100, 1101-03, 1113-14 (9th Cir. 2008) (discussing application of enhancement for defendants who targeted government and private buildings that defendants believed were responsible for degrading the environment); United States v. Tubbs, 290 Fed. Appx. 66, 68 (9th Cir. 2008) (enhancement applied where defendant conspired to burn government-owned ranger station); United States v. Salim, 549 F.3d 67, 77-79 (2d. Cir. 2008) (enhancement warranted where crimes against federal corrections officer were motivated in part by defendant's desire to retaliate against judge for rulings on request for substitution of counsel); United States v. Cleaver, 163 Fed. App'x 622, 624-25, 631 (10th Cir. 2005) (enhancement applied where defendant intended to destroy IRS property by fire, forcibly interfering with IRS employees and administration, suborning perjury, and tampering with a witness); United States v. Dowell, 430 F.3d 1100, 1110-11 (10th Cir. 2005) (similar); United States v. Christianson, 586 F.3d 532, 537-40 (7th

Cir. 2009) (enhancement applied to conspiracy to destroy Forest Service property).

Defendant might try to avoid the enhancement by arguing that he never intended to coerce or intimidate the government because he did not want to hurt anyone or collide with the ship, and that he was motivated solely by a desire to publicize the government's response to pandemic rather than to influence or retaliate against the government for deployment of the USNS Mercy. Any such argument should be rejected. First, defendant, by his own admission, derailed the train in response to the government's deployment of the USNS Mercy. Additionally, the totality of defendant's statements demonstrate that he also believed the ship was (at the very least) dangerous and that public pressure might "wake people up" and bring about its removal. Moreover, defendant need only have had the specific intent to commit the offense of train wrecking -- whether he was personally motivated to influence the government is not dispositive. The enhancement applies so long as "[the defendant] intended to promote a crime calculated to have such an effect . . . whatever [the defendant's personal] reason" for committing the crime. See United States v. Awan, 607 F.3d 306, 317-18 (2d Cir. 2010) ("A hired assassin who kills a political leader at the behest of a terrorist organization can hardly disclaim that his crime was calculated to influence the conduct of government simply because he was motivated by greed rather than politics.").

The Court should respectfully find that defendant's purposeful derailment of the train toward a naval hospital ship was "calculated" to influence or retaliate against government conduct under § 3A1.4 for sentencing purposes. See, e.g., United States v.

7

1  Wright, 747 F.3d 399, 418-19 (6th Cir. 2014) (Clay, J. concurring)

2  (imposing enhancement despite claim that goal of bombing was to

3  affect the economically advantaged); United States v. Haipe, 769 F.3d

4  1189, 413 (D.C. Cir. 2014) (defendant's money raising goals in

5  kidnapping did not preclude finding of intent to influence government

6  policy).

7      Therefore, the terrorism enhancement applies.  With the

8  terrorism enhancement, defendant's Guidelines range is as follows:

9      Offense Level:              32 (U.S.S.G. § 3A.1.4)

10     Criminal History Category:  VI (U.S.S.G. § 3A.1.4)

11     Range of Imprisonment:      151-188 months after a three-level

12 reduction for acceptance of responsibility.

13     Consistent with the terms of the plea agreement, the government

14 recommends a downward departure for the correctly calculated

15 guidelines sentence, and believes that a sentence of 77 months'

16 imprisonment is appropriate.

17 **V.   THE PUBLIC WELFARE DEPARTURE APPLIES**

18     In addition to the terrorism enhancement, the public welfare

19 departure under U.S.S.G. § 5K2.14 applies.  First, pursuant to the

20 plea agreement, the parties agreed that a one-level enhancement

21 applies pursuant to the public welfare departure.  (Plea Agreement,

22 ¶ 13.)  Additionally, if "national security, public health, or safety

23 was significantly endangered, the court may depart upward to reflect

24 the nature and circumstances of the offense."  U.S.S.G. § 5K2.14.

25 Here, defendant derailed a train.  He barely missed hitting innocent

26 bystanders and caused hundreds of gallons of fuel to leak.  These

27 facts alone justify the one-level upward departure.  United States v.

28 Semsak, 336 F.3d 1123 (9th Cir. 2003) (Four-level upward departure

8

1  under U.S.S.G. § 5K2.14 for defendant convicted of involuntary

2  manslaughter was justified, where defendant had a high blood-alcohol

3  level, drove his 80,000-pound, 18-wheel truck on the wrong side of

4  the road, and ignored repeated warnings and efforts to prevent the

5  accident.)

6  **VI.   GOVERNMENT'S SENTENCING RECOMMENDATION**

7      Defendant's offense was extraordinarily serious, and he used his

8  unique access as a licensed train conductor to derail a multi-ton

9  train toward a government hospital ship whose purpose was to treat

10  vulnerable patients in the midst of a global pandemic.  Even assuming

11  defendant did not actually intend to harm anyone on board or to

12  collide with the ship itself, his reckless disregard for human life -

13  - and the impact the offense was designed to have on an already

14  frightened public in the midst of the pandemic -- warrants a prison

15  sentence longer than 30 months' imprisonment.  See 18 U.S.C. §

16  3553(a)(1).

17      Defendant's desire to receive press coverage in connection with

18  his crime is all the more reprehensible.  For example, his actions

19  had the potential to dissuade or frighten members of the public away

20  from hospitals out of a fear that they might be targeted by violent

21  conspiracy theorists.  His actions also had the potential to

22  encourage other conspiracy theorists around the country to act on

23  dangerous beliefs in ways that, as here, were intended to coerce or

24  intimidate the government and ultimately threaten the public.

25      Despite the very serious nature of defendant's actions,

26  consistent with the terms of the plea agreement the government

27  recognizes that a downward variance from the correctly calculated

28  guidelines range is appropriate here.  Defendant has no prior

9

criminal history.  Based on letters from friends, former employers, and other information provided by defense counsel, defendant was "a dedicated family man who built strong ties to his community through volunteer work, coaching youth baseball, and from decades captaining fishing boats" leading up to the date of the offense.  (Defendant ("Def."). Sentencing Position Paper, Exhibit 1.)  FBI interviews of defendant's colleagues indicate that he had a good discipline record at PHL was considered a senior employee.

Given that defendant's offense appears isolated and inconsistent with his personal history and characteristics, a fact noted by the government's retained psychiatrist, there is a reduced need for specific (though not general) deterrence in this case, and -- assuming defendant's conspiracy delusions subside following some form of treatment or counseling while incarcerated and while on supervised release -- defendant is probably less likely than other terrorism offenders to recidivate.  See U.S.S.G. § 4A1.3(b)(1) ("[i]f reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted.")  Based on the information provided by defense counsel, defendant appears to have a solid network of family and friends in Southern California.  Although defendant was motivated by online conspiracy theories, he has no discernible ties to other violent ideologies or domestic extremist groups.  See 18 U.S.C. § 3553(a)(4)-(6).  He has also been generally cooperative since his arrest, not only by repeatedly confessing, but also by waiving his rights to indictment and preliminary hearing at a time that was helpful to the Court and the government given the early

stage of the pandemic in Los Angeles County when defendant was charged.

Therefore, the government recommends defendant be sentenced to a term of imprisonment no less than 77 months' imprisonment, which includes a three-category downward departure for criminal history, as well as a five-level downward variance based on the § 3553(a) factors discussed above.  See, e.g., United States v. Benkahla, 501 F. Supp. 2d 748 (E.D. Va. 2007) (downward variance warranted in terrorism enhancement case where defendant had no criminal record and did not share the same characteristics or conduct of a terrorist, and thus did not share the same likelihood of recidivism, difficulty of rehabilitation, or need for incapacitation); see also, United States v. Mehanna, No. 09-10017-AO (D. Mass. 2012) (dkt. 439) (indicating that automatic assignment of category VI and 12-level adjustment did not properly account for "the unique facts of the given case").

With a three-category downward departure for criminal history and a five-level downward variance, defendant's Guidelines range would be 63-78 months' imprisonment after acceptance of responsibility.  A sentence within that range of 77 months' imprisonment followed by a lifetime of supervised release would be sufficient, but not greater than necessary, to achieve the purposes set forth in 18 U.S.C. § 3553(a).  The government also recommends that defendant participate in mental health treatment while in custody, and participate in enhanced mental health treatment during supervised release.

**VII. DEFENDANT KNOWINGLY AND WILLFULLY DERAILED THE TRAIN**

At the change of plea hearing, defendant made clear that he entered a change of plea hearing intelligently, knowingly, and

1   voluntarily.  Although defendant filed a notice of insanity defense
2   on June 23, 2021 (Dkt. 56), he withdrew his intent to pursue an
3   insanity plea at his change of plea hearing.  On December 16, 2021,
4   defense counsel informed the Court that defendant and defense counsel
5   discussed this issue "numerous times, and spent a lot of time on it.
6   . . . [defendant is] fully competent, this is [defendant's] decision,
7   and that this plea is voluntary, knowing, and intelligent."  (Dkt.
8   No. 70, Transcript of Defendant's Change of Plea Hearing
9   ("Transcript"), Pages 21:22 to 22:7.)  Yet, the USPO relied on the
10  very same mental health report ("Defense Mental Health Report") that
11  defendant provided to the government to support his insanity defense.
12  Based on the USPO's reading of the Defense's Mental Health Report,
13  the USPO recommended a sentence of 30 months' imprisonment,
14  substantially below the Guidelines range.

15      Defendant withdrew his insanity plea at the change of plea
16  hearing and did not cite to or submit the Defense's Mental Health
17  Report for this Court to consider.  Therefore, the Court should not
18  rely on the USPO's reliance on the Defense Mental Health Report.  The
19  government retained a psychiatrist, but defendant refused to allow
20  the government's retained psychiatrist to interview defendant.  The
21  government's psychiatrist reviewed the Defense's Mental Health
22  Report, stated that he could not come to a clinical conclusion
23  without interviewing Mr. Moreno, and drafted his report.  (See
24  Government's Exhibit B, filed under seal.)  Without going into the
25  specific findings in the under-seal report, the government already
26  considered the fact that defendant's actions are isolated and
27  inconsistent with his personal history and characteristics when
28  recommending the downward variance from the terrorism enhancement for

a 77-month custodial sentence.  Again, defendant admitted to derailing the train and there is no issue of insanity before the Court.  The government concedes that defendant needs mental health treatment, but in the purview of rehabilitation so defendant does not act out in violence again.

**VIII.   RESTITUTION**

Pursuant to the plea agreement, defendant agreed to pay restitution to PHL.  According to PHL documents, the government recommends that defendant pay approximately $755,880.46 in restitution.  However, there are additional costs that may be in dispute.  The government requests a restitution hearing to be set in 60 days.  If the parties agree to the additional restitution amount, the parties will request the restitution hearing be taken off calendar.

**IX.   CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court impose the following sentence: (a) 77 months' imprisonment; (b) followed by a lifetime of supervised release with mental health treatment; (c) a restitution order of $755,880.46 and any additional restitution to be determined at a later time; and (d) a special assessment of $100.